## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1)THE COUNTY COMMISSION OF
OKMULGEE COUNTY, OKLAHOMA,

       Plaintiff,

v.

(1)PURDUE PHARMA, L.P.;
(2)PURDUE PHARMA, INC.;
(3)THE PURDUE FREDERICK COMPANY,
INC.;
(4)TEVA PHARMACEUTICAL INDUSTRIES,
LTD;
(5)TEVA PHARMACEUTICALS USA, INC.;
(6)CEPHALON, INC.;
(7)JANSSEN PHARMACEUTICALS, INC.;
(8)ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.;
(9)NORAMCO, INC.;
(10)MALLINCKRODT plc;
(11)MALLINCKRODT LLC;
(12)JOHNSON & JOHNSON;
(13)ENDO HEALTH SOLUTIONS, INC.;
(14)ENDO PHARMACEUTICALS, INC.;
(15)INSYS THERAPEUTICS, INC.;
(16) INSYS PHARMA, INC.;
(17)ALLERGAN plc;
(18)ACTAVIS plc;
(19)ACTAVIS, INC.;
(20)ACTAVIS LLC;
(21)ACTAVIS PHARMA INC.;
(22)WATSON PHARMACEUTICALS, INC.;
(23)WATSON PHARMA, INC.;
(24)WATSON LABORATORIES, INC.;
(25)MCKESSON CORPORATION;
(26)CARDINAL HEALTH 110, LLC; AND
(27)THE HARVARD DRUG COMPANY, LLC,
D/B/A MAJOR PHARMACEUTICALS, D/B/A
RUGBY LABORATORIES;
(28)AMERISOURCEBERGEN DRUG
CORPORATION;
(29)H.D. SMITH WHOLESALE DRUG
COMPANY; and
(30)H.D. SMITH, LLC;

Defendants.

## COMPLAINT

Plaintiff, the County Commission of Okmulgee, Oklahoma, sues Defendants Purdue Pharma, L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Johnson & Johnson; Mallinckrodt plc; Mallinckrodt LLC;; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Insys Therapeutics, Inc.; Insys Pharma, Inc.; Allergan plc; Actavis plc; Actavis, Inc.; Actavis LLC; Actavis Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Pharma, Inc.; Watson Laboratories, Inc.; McKesson Corporation ("McKesson"); Cardinal Health 110, LLC; and The Harvard Drug Company, LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories; AmerisourceBergen Drug Corporation; H.D. Smith Wholesale Drug Company; and H.D. Smith, LLC., and for causes of action states as follows:

## INTRODUCTION

1.      For many years, the prospect of a major drug problem infiltrating the borders of Oklahoma, let alone Okmulgee County, was inconceivable.

2.      Okmulgee  County hosts predominantly middle class families in, Oklahoma, and has a population of approximately 91,444 people.  Still, within this modest setting rages an unexpected war between health and opioid-addiction.  As of 2016, the Centers for Disease Control and Prevention, hereinafter "CDC," lists the overall prescribing rate of opioids at 66.5 prescriptions per 100 people.[1]  By contrast, the CDC shows that Okmulgee County Oklahoma's

---

[1] See www.cdc.gov/drugoverdose/maps/rxrate-maps; citing QuintilesIMS Transactional Data Warehouse (TDW) 2006–2016.

prescribing rate was 97.1 prescriptions per 100 people in 2016. Okmulgee County, like many small communities throughout the country, faces a long road of re-education, rehabilitation, and rebuilding in the wake of what has become popularly known as the "Opioid Epidemic."[2]

3.     Prescription opiates are narcotic drugs.  They are derived from or possess properties similar to opium and heroin, and are categorized as "Schedule II" drugs due to their high potential for abuse and potential to cause severe psychological or physiological dependence. The terms "opioids" and "opioid analgesics" describe the entire class of natural and synthetic opiates.

4.     Within the last 20 years, a scourge infected this country in the form of a public health epidemic caused by widespread addiction to opioids like OxyContin and Percocet, as well as generic forms of oxycodone and hydrocodone.  The Food and Drug Administration ("FDA") originally approved opioid treatment for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[3]  Later, the label was stretched to reach treatment of patients with "chronic pain": pain lasting more than three months.

5.     Like other communites in America, Okmulgee County fell victim to pharmaceutical manufacturers and wholesaler/distributors that saturated the area with excessive amounts of dangerous and addictive prescription opioids under the guise of lawful and beneficial activity.

6.     The Opioid Epidemic did not come to Okmulgee County by chance.  Rather, opioids were intentionally pumped into the area by opioids manufacturers and distributors who

---

[2]   L. Manchikanti et al., *Opioid Epidemic in the United States*, available at https://www.ncbi.nlm.nih.gov/pubmed/22786464.
[3] Opioid was originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics. Stedman's Medical Dictionary 27th Edition.

engaged in targeted marketing and over-distribution in the most unsuspecting areas of the country.  The Opioid Epidemic is immediately traceable to the highly deceptive and unfair marketing campaigns employed to re-educate physicians using misleading marketing materials, rather than scientific facts, to foster a culture of opioid use in unsuspecting patients.

7.      The manufacturers of opioids overstated their efficacy and understated their addictive properties.  Intent on driving up profits by selling more and more, the marketing strategies of each manufacturer included encouraging physicians to increase dose amounts and frequencies over time to keep up with patients' increased tolerance. Because of the patients' increased tolerance and resulting need for increased dosages, as well as the patient's addiction to the drug, the manufacturers gained a lifetime customer with each prescription written.

8.      The manufacturers and distributors of opioids knew of the dangerously addictive qualities and high rates of loss and misappropriation ("diversion rates") of their drugs yet failed to educate the public and prescribers of those dangers.

9.      The distributors, as deliverers of opioids through a sophisticated closed distribution system described herein, had a duty to forestall and report diversion.  They disregarded their own real-time data and failed to report and/or halt red-flagged, facially suspicious orders from pharmacies.

10.      Each Defendant here, as defined *infra*, profited enormously from the movement of opioid products through areas like Okmulgee County.  Each has incentives to promote the utilization of opioid drugs over others.  Defendants, as opioid manufacturers and distributors, created these incentives and share in their perversity – usually without disclosure to those who reasonably rely on Defendants to abide by their federal, state, and common law duties.  Some of these incentives – such as those promoting growing sales of opioids – conflict with laws requiring

that orders and shipments be monitored to ensure that opioids were not diverted.  Defendants chose self-interest and maximization of profits over compliance.

11.     The primary motivating factor behind Defendants' actions that contributed to the Opioid Epidemic was maximization of profits.  The effect of their actions has been both long-term and wide-spread.  Within the next hour, six Americans will die from an opioid overdose; two babies will be born dependent on opioids and begin to exhibit symptoms of neonatal abstinence syndrome; and prescription opioid drug manufacturers will earn over $2.7 million from the sale of their drugs.

12.     Each Defendant contributed to creating a public nuisance of historic proportions, by flooding Okmulgee County with excessive amounts of these dangerous and addictive medications.  Defendants' actions are a serious breach of the public trust which has resulted in drug misuse and abuse, addiction, and deaths, as well as great expense and financial impact for Okmulgee County, a first responder to the Opioid Epidemic.

13.     In reaction to this man-made public health crisis, in order to care for and protect the members of its community, Okmulgee County incurred substantial costs to fund a wide range of public services including health care, foster case, law enforcement and emergency responder services, criminal justice administration, public assistance, addiction treatment programs, overdose reversal medication, treatment to babies affected by neonatal abstinence syndrome, and other services and programs.

14.     The costs to Okmulgee County include significant increases in expenditures on emergency services for responding to the overdose calls as well as law enforcement call-outs to investigate crimes that are the natural product of increased drug abuse.

15.     These costs should be borne by Defendants, as creators of the issues plaguing this

community, rather than the county's taxpayers.  This action is therefore brought to expose the Defendants' misdeeds, stop the proliferation of opioids, recoup the expenses and penalties owed, recover the damages suffered by Okmulgee County, and perhaps most importantly, to abate the continuing public nuisance caused by the actions of Defendants and force them to help fund and solve the problem they created.

**PARTIES**

I.    **PLAINTIFF**

16.    Plaintiff, the County Commission of Okmulgee County, is authorized to bring this action on behalf and for the benefit of Okmulgee County at large.  *See* 19 OKLA. STAT. §1. Plaintiff is hereinafter referred to as "Okmulgee County."

17.    The distribution and diversion of opioids within Okmulgee County and Oklahoma created the foreseeable public health crisis and opioid public nuisance complained of herein.  The damages suffered by Okmulgee County were foreseeable and proximately caused by the actions of Defendants.

18.    The collective actions of Defendants have caused and will continue to cause Okmulgee County to expend substantial sums of public funds to deal with the significant consequences of the Opioid Epidemic and resulting public nuisance that was created by Defendants' illegal, reckless, and malicious actions in flooding the state with highly addictive prescription medications without regard for the adverse consequences to Okmulgee County or its residents.

19.    Plaintiff has standing to recover the damages incurred as a result of Defendants' acts and omissions.  Plaintiff has standing to bring all claims pled herein, including those brought under the federal RICO statute, pursuant to 18 U.S.C. §§ 1961(3) and 1964.

## II.     MANUFACTURER DEFENDANTS

20.     Each Defendant listed below, manufactured, packaged, sold, placed into the stream of commerce, labeled, marketed, advertised, and promoted prescription opioid drugs. They are referred to collectively as "Manufacturer Defendants".  The prescription opioid drugs made by Manufacturer Defendants were sold and/or consumed in Okmulgee County. Upon information and belief, each Manufacturer Defendant and their affiliates were registered to do business in the State of Oklahoma and did, in fact, do business in the State of Oklahoma during the relevant time period.  Upon information and belief, the prescription opioid drugs manufactured by each Manufacturer Defendant were sold and/or consumed in Okmulgee County during the relevant time period.

21.     Manufacturer Defendants are "registrants" under the federal Controlled Substances Act ("CSA").  21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823.  Section 823(a), in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

22.     Oklahoma law mandates that all drug manufacturers apply for and receive a license from the State Board of Pharmacy. 63 OKLA. STAT. § 1-1119.  Upon information and belief, each Manufacturer Defendant maintained licensure through the State of Oklahoma for the wholesale distribution of controlled substances pursuant to multiple state regulations.

### A.   Purdue Defendants

23.     Purdue Pharma, L.P., is a limited partnership organized under Delaware law with its principal place of business in Stamford, Connecticut. Purdue Pharma, Inc., is a New York Corporation with its principal place of business in Stamford, Connecticut. Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc., are hereinafter collectively

referred to as "Purdue."

24.     Purdue engaged in manufacture, promotion, and sale of the opioids referenced in this Complaint, including the following:

      a.  OxyContin, a Schedule II[4] opioid drug;

      b.  MS Contin, a Schedule II opioid drug;

      c.  Dilaudid, a Schedule II opioid drug;

      d.  Dilaudid-HP, a Schedule II opioid drug;

      e.  Butrans, a Schedule III opioid drug;

      f.  Hysingla ER, a Schedule II opioid drug; and

      g.  Targini.

25.     Purdue's national annual sales of OxyContin alone reached almost $3 billion in 2009, up from 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for painkiller drugs.

    B.  Cephalon Defendants

26.     Defendant Teva Pharmaceuticals USA, Inc., is a Delaware corporation with its principal place of business in North Whales, Pennsylvania.  Teva Pharmaceuticals USA is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation. Collectively, these entities are referred to as "Teva."

27.     Defendant Cephalon, Inc., is a Delaware corporation operating its principal place of business in Frazer, Pennsylvania.  In 2011, Teva Pharmaceutical Industries, Ltd., acquired Cephalon, Inc.

---

[4] As scheduled by the DEA.

28.     Teva Pharmaceuticals USA and Cephalon, Inc., work closely to market, manufacture, sell, and distribute Cephalon products, Schedule II opioid drugs Actiq and Fentora, in the United States. Teva Pharmaceuticals USA, Inc., markets these drugs as Teva products, and sells all former Cephalon branded products through its "specialty medicines" division.

C.  Janssen Defendants

29.     Janssen Pharmaceuticals, Inc., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., f/k/a Janssen Pharmaceutical, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  It is a wholly owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. In addition, Noramco, Inc., was a wholly owned subsidiary of Johnson & Johnson, until July, 2016. Noramco, Inc., is incorporated in Delaware and has its principal place of business in Wilmington, Delaware.

30.     Johnson & Johnson controls the sale and development of Janssen products, and corresponds with the FDA regarding Janssen products.

31.     Janssen developed, marketed, and sold Schedule II opioid drugs Nucynta and Nucynta ER until 2015, with 2014 sales of $172 million.  Additionally, Janssen manufactured, promoted, sold, and distributed Duragesic, a Schedule II opioid drug.

D.  Endo Defendants

32.     Endo Health Solutions, Inc. and its wholly owned subsidiary Endo Pharmaceuticals, Inc., are Delaware corporations with principal places of business in Malvern, Pennsylvania.  These entities are referred to collectively as "Endo."

33.     Endo develops, markets, and sells Schedule II opioid drugs Opana and Opana ER, Percodan, and Percocet.

34.     The opioids sold by Endo contributed to $403 million of Endo's $3 billion in revenue in 2012.  Opana ER alone accounted for $1.15 billion total for the years 2010 through 2013.

35.     Endo also manufactures and sells generic opioids including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

E.   Insys Therapeutics, Inc., Defendant

36.     Insys Therapeutics, Inc., ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.  Insys Pharma, Inc., is a wholly owned subsidiary of Insys Therapeutics, Inc.

37.     Insys manufactured and sold the highly addictive opioid prescription drug Subsys.

F.   Actavis Defendants

38.     Allergan plc is incorporated in Ireland with its principal place of business in Dublin, Ireland. By way of history, Watson Laboratories, Inc., a Nevada corporation with its principal place of business in Corona, California, acquired Actavis, Inc. in October, 2012. The name changed to Actavis, Inc. then Actavis plc in October, 2013. Actavis plc acquired Allergan plc in March, 2015. The acquisition resulted in another name change to Allergan plc.

39.     Actavis, LLC, is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc., formerly Actavis, Inc., and Watson Pharma, Inc., is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

40.     Actavis plc, Actavis, Inc. Actavis, LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are owned by Allergan plc (collectively "Actavis").

41.     The drugs marketed and sold by Actavis includes Schedule II drugs Kadian and

Norco (generic Kadian), and generic versions of Duragesic and Opana (previously discussed).

    G.  <u>Mallinckrodt Defendants</u>

42.    Mallinckrodt, plc, is an Irish public limited company headquartered in United Kingdom, with its United States headquarters in St. Louis, Missouri. formerly Mallinckrodt, LLC, is incorporated in Delaware with its principal place of business in New Mexico.

43.    Mallinckrodt manufactures, markets, sells, and distributes generic forms of hydrocodone and oxycodone.

44.    Collectively, the above-referenced opioid drug manufactures are referred to as "Manufacturer Defendants."

**III.    DISTRIBUTOR DEFENDANTS**

45.    Each Defendant listed below, distributed, supplied, sold, marketed, advertised, and placed into the stream of commerce prescription opioid drugs.  They are referred to collectively as "Distributor Defendants".  Each Distributor Defendant was engaged in the "distribution" or "wholesale" of prescription opioid drugs.

46.    Distributor Defendants are "registrants" under the federal Controlled Substances Act ("CSA").  21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823.  Section 823(b), in turn, requires distributors of Schedule II controlled substances to register with the DEA.

47.    Oklahoma law mandates that all drug distributors apply for and receive a license from the State Board of Pharmacy. 63 OKLA. STAT. § 1-119.  Upon information and belief, each Distributor Defendant maintained licensure through the state of Oklahoma for the wholesale distribution of controlled substances pursuant to multiple state regulations.

A.  McKesson Corporation Defendant

48.     McKesson Corporation ("McKesson") is a Delaware Corporation with headquarters in California.

49.     Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.  McKesson is the largest pharmaceutical distributor in North America.  McKesson delivers approximately one third of all pharmaceuticals used in North America.

B.  Cardinal Health Defendants

50.     Defendants; Cardinal Health 110, LLC;, LLC are for-profit Ohio Corporations.

51.     The Harvard Drug Group LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories is a wholly owned subsidiary of Cardinal Health, Inc., as of 2015. The principal place of business for The Harvard Drug Group LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories is 31778 Enterprise Drive, Livonia, Michigan.

52.     These Defendants are referred to collectively herein as "Defendant Cardinal."

53.     Specifically, Defendant Cardinal distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments. Cardinal is the third largest pharmaceutical distributor in North America.

C.  AmerisourceBergen Defendant

54.     Defendant AmerisourceBergen Drug Corporation ("Amerisource Bergen" or "ABDC") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania.

55.     Specifically, Defendant AmerisourceBergen distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health

departments. AmerisourceBergen is the second largest pharmaceutical distributor in North America; along with McKesson Corporation and Cardinal Health, AmerisourceBergen is a "Big Three" distributor.

56.     Defendants H.D. Smith Wholesale Drug Company and H.D. Smith, LLC, (collectively "H.D. Smith") have principal places of business in Springfield, Illinois.  The H.D. Smith website specifies that the entity is a wholesale distributor for "independent pharmacies."

57.     Defendant AmerisourceBergen Drug Corporation acquired H.D. Smith in a late 2017, early 2018 transaction.[5]

58.     Collectively, the above-referenced prescription opioid drug distributors are referred to as "Distributor Defendants."

## JURISDICTION AND VENUE

59.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on the federal claims asserted herein. This Court may exercise supplemental jurisdiction over the state law claims included herein under 28 U.S.C. § 1367 as they arise from the same case or controversy as the federal claims.

60.     This Court also has jurisdiction under 28 U.S.C. § 1332, as Plaintiff is a "citizen" of this State, while Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.

61.     Venue is proper pursuant to 28 U.S.C. § 1391.

62.     This Court has personal jurisdiction over each Defendant as each purposefully availed itself of the privilege of exploiting forum-based business opportunities.  Defendants

---

[5] AmerisourceBergen Completes Acquisition of HD Smith (Jan. 3, 2018)
https://www.amerisourcebergen.com/abcnew/newsroom/press-releases/amerisourcebergen-completes-acquisition-of-hd-smith.

deliberately and regularly transact or transacted business in Okmulgee County, Oklahoma, and Plaintiff's causes of action arose in Okmulgee County, Oklahoma.

## FACTUAL BACKGROUND

63.     Okmulgee County, Oklahoma with a population of approximately 91,444, is an idyllic county with a rich history, proud of its people, and committed to creating and preserving the American way of life for its many residents.  Defendants' scheme occurred in Okmulgee County, Oklahoma, over the years 2007 through 2016.

64.     The subject scheme involved acts and omissions on behalf of each Defendant to promote opioid use and inevitable overuse and abuse across the country, including in Okmulgee County.  In a concerted effort to expand the market for opioids, Manufacturer Defendants falsely marketed the benefits and underscored the risks associated with opioid use.  Meanwhile, Distributor Defendants distributed unreasonably high quantities of opioids to pharmacies throughout the state.

65.     The scheme could not have worked without each Defendant playing their respective part or at a minimum, remaining silent about the absurd volume of drugs which they were collectively pushing into Okmulgee County.

66.     What resulted from the success of Defendants' scheme was more than a marginal amount of excess medication.  The resulting damage to Okmulgee County has been devastating. The problems Okmulgee County, its residents and visitors, its businesses and schools, its police and courts, are currently facing were caused by the Defendants' reckless disregard.

## I.      OPIOIDS GENERALLY

67.     As explained above, the term "opioid" refers to a class of drugs that bind with opioid receptors in the brain to produce analgesia, euphoria, and respiratory depression, among

other effects. Natural opioids are derived from the opium poppy, but modern medicine has permitted for the creation and use of synthetic and semi-synthetic opioids.

68. The medicinal properties of opioids have long been recognized, with the first widely known and used opioid drug morphine being commercially marketed as early as the 1820s. The use of morphine during the Civil War resulting in a slew of veteran morphine addicts. Still, prescription opioids continued to be developed by pharmaceutical companies into the twentieth century.

69. Perhaps a reflection of the knowledge regarding addiction gained from early morphine use, opioids were limited to short-term use (not longer than 90 days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was limited, for medical conditions such as post-surgical pain, trauma pain, and palliative care, for which opioids were proven effective. Only after deliberate interference by Manufacturer Defendants into the professional judgment of physicians through aggressive marketing techniques did physicians consider opioids to be an acceptable long-term treatment for chronic pain (pain lasting more than 90 days). Those efforts by Manufacturer Defendants that caused and/or contributed to the Opioid Crisis as it affects Okmulgee County are further detailed *infra*.

   A. Opioids as Addictive Substances Subject to Tolerance Increases

70. Any belief that long-acting opioids, such as OxyContin made by Defendant Purdue Pharma, would not prompt abuse and addiction was never grounded in science and has been expressly discredited. In response to a 2013 physician-lead petition to restrict the labels of long-acting opioid products, the FDA acknowledged "grave risks" associated with opioids including "addiction, overdose, and even death."

71. A principal risk of long-term opioid use is that effectiveness wanes and patient

tolerance increases such that the dose necessary to reach previously obtained analgesic relief can become "frighteningly high."[6]  Where a patient reaches such doses, the risk and severity of withdrawal symptoms increases as well, leaving the patient at a higher risk of abuse, addiction, and progression to illegal drug use.  Users become convinced that the drug is "needed to stay alive."[7]

72.    Still, use for even a few weeks results in withdrawal symptoms when the opioid is discontinued, including severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, and delirium; these withdrawal symptoms may last months, depending on the duration of opioid use.

73.    In addition, patient tolerance to opioids' analgesic actions, which requires higher doses of drugs to have the same effect, rises at a faster rate than patient tolerance to the respiratory depressive effects of opioids.  Thus, increasing dose amounts and/or frequency to match tolerance of analgesic effect can lead to overdose and death even when opioids are taken as directed.

74.    In fact, all labels of Schedule II long-acting opioids must include the warning that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." The FDA now requires extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" because the drugs present a "serious public health crisis of addiction, overdose, and death."

75.    The FDA thereby confirmed the line of thinking that pre-dated the Manufacturer Defendants' marketing scheme: due to their risks, opioids should be used "only when alternative

---

[6] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).
[7] David Montero, *Actor's Death Sows Doubt Among O.C.'s Recovering Opioid Addicts*, The Orange Cnty. Reg. (Feb 3, 2014), https://www.ocregister.com/2014/02/04/actors-death-sows-doubt-among-ocs-recovering-opioid-addicts/  (accessed Dec. 20, 2017).

treatments are inadequate." The FDA expressly recognized that no long-term studies demonstrate the safety and efficacy of opioids for long-term use.

76. Because of their addictive effect, Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opined in 2011 that opioids are more destructive than crack cocaine:

> "[Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[8]

77. Even the creation of Abuse Deterrent Formula ("ADF") opioids failed to curb the addiction and prescription rate, with 96% of all opioid products prescribed in 2015 being non-ADF.[9] The addiction to opioids is real and has proven very difficult to prevent, curb, and treat.

B. Opioids as Causing Significant, Non-Addiction Related Side Effects

78. Opioid use comes with additional negative side effects not related to addiction.

79. Defendant Endo's research shows that opioid patients report higher rates of obesity, insomnia, and self-described fair or poor health compared to patients taking other prescription pain medication. A 2008 study by the Mayo Clinic[10] found that patients who were weaned off opioids

---

[8] Transcript, Use and Abuse of Prescription Painkillers, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.
[9] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SHAKOPEE V. NEWS, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managers-are-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-61d29d25c84b.html.
[10] Cynthia O. Townsend et al., *A longitudinal study of the efficacy of a comprehensive pain rehabilitation program with opioid withdrawal: comparison of treatment outcomes based on opioid use status at admission*, 140 J. PAIN, 177 (Nov. 15, 2008), available at https://www.ncbi.nlm.nih.gov/pubmed/18804915.

and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but others do not.[11]

80.     Other studies have found opioids inefficient in treating migraine pain, and associated with sleepiness, confusion, increase in frequency of headaches, and increase in depression susceptibility

81.     Increased opioid use is also associated with an increased likelihood of other mental health conditions such as anxiety, and psychological distress; healthcare utilization, and a general decrease in health and wellness.  In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[12] Many abusers start with legitimate prescriptions.

### C.     Opioids as a Gateway to Heroin Use

82.     Heroin produces a very similar high to prescription opioids but is often cheaper. While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price.

83.     Because of the disparate cost of heroin versus opioids and their similar effect, opioid abuse has triggered resurgence in heroin abuse. According to one national-level study, nearly 80% of heroin users reported that they used prescription opioids prior to heroin.  Similar rates apply even to our nation's youth: a 2015 report out of New York University found that three-quarters of high school seniors nationwide who use heroin started with prescription opioids.

---

[11] Barry Meier & Abby Goodnough, *New Ways to Treat Pain Meet Resistance*, N.Y. TIMES, Jun. 22, 2016, https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html.
[12] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 MORBIDITY & MORTALITY WKLY REP. 1378, 1381 ( Jan. 1, 2016), *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

84.     It is hard to imagine the powerful pull that would cause a law-abiding person who started on prescription opioids for an injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

85.     The need to address heroin use and addiction has imposed additional burdens on Okmulgee County and other Oklahoma cities and towns.

86.     The prescription, dispensing, and reimbursement of controlled substances, in this case, opioids, begins with the federally registered manufacturer of an FDA approved Schedule I drug, *see* 21 U.S.C. § 823(a), "educating" a physician on the usefulness of the drug. The next step involves the physician, licensed by their state Board of Medicine, writing a prescription for the drug. The patient, with valid prescription in hand, seeks out a pharmacy to fill the order. The pharmacy must also be licensed by the State Board of Pharmacy and Drug Enforcement Agency to dispense controlled substances. The opioids which get dispensed by pharmacies arrive in the pharmacy through a distribution channel made up of state and federally regulated distributors. These distributors are charged with a responsibility to ensure that the orders they fill for pharmacy and hospital customers are not facially suspicious, as defined by the DEA in conjunction with the distributor.

87.     Patients' wellbeing requires an open, honest, transparent communication of the risk and benefits of the drug between the manufacturer and prescriber, and among the prescriber, pharmacist, and patient together. The distributor plays a crucial role in keeping dangerous and addictive pills out of the hands of pharmacies and abusers. The Opioid Epidemic is an example of what occurs when the parties responsible for protecting patients let greed interfere with their duties.

II.     **ROLE OF MANUFACTURER DEFENDANTS**

88.     Manufacturer Defendants, with the idea that their drugs could reach a larger market of chronic pain sufferers, engaged in widespread, aggressive marketing campaigns focused solely on the benefits of their drugs. In doing so, Manufacturer Defendants knew of, capitalized on, and actively and intentionally concealed the fact of patient tolerance of the analgesic effects of opioid drugs. In order to create opportunities for more prescriptions, the Manufacturer Defendants specifically and successfully promoted the idea that pain should be treated as a fifth "vital sign." They further promoted the idea that pain should be treated continuously by long-acting opioids (e.g., OxyContin, MS Contin, Nucynta ER, Duragesic, Opana ER, and Kadian) and supplemented with short-acting, rapid-onset opioids (e.g., Actiq and Fentora) for episodic pain.

89.     Marketing efforts, rather than any medical breakthrough, rationalized the prescribing of opioids for chronic pain, thereby opening the floodgates for opioid misuse, abuse, and addiction.

90.     The marketing methods employed by Manufacturer Defendants included face-to-face meetings with prescribers through directly employed salespeople. Through countless meetings, presentations, invitations to speak at events, bonus structures, brand perks, and expenses-paid trips, Manufacturer Defendants indoctrinated prescribers with the belief that opioids were appropriate—and even necessary—for treatment of chronic pain sufferers.

91.     This approach proved effective: a report by the U.S. Senate Homeland Security & Governmental Affairs Committee found "a clear link [] between even minimal manufacturer payments and physician prescribing practices."[13]

92.     Manufacturer Defendants also hosted Continuing Medical Education ("CME") programs and, due to their control over the information that was provided, used such programs to

---

[13] Staff Report, Fueling an Epidemic, Insys Therapeutics and the Systemic Manipulation of Prior Authorization.

create a generation of doctors who accepted the message that opioid treatment was optimal for their pain patients.

93.     Taking their interactions with prescribers to an even higher level, Manufacturer Defendants also used puppet prescribers known as "Key Opinion Leaders," who promoted opioid drugs at speaking events and CME seminars under the guise that they were sharing a genuine, considered medical opinion regarding treatment options for patients.  These Key Opinion Leaders reaped rewards in the form of case referrals, preceptorships, speaking fees, travel expenses, grants, prestige, recognition, research funding, and publications, through Manufacturer Defendants.

94.     Manufacturer Defendants also printed advertisements in medical journals, such as the specialty-focused *Journal of Pain* and the *Clinical Journal of Pain* as well as the broad-audience *Journal of the American Medical Association*.  Their advertising became so aggressive during the proliferation of the Opioid Epidemic that 2011 expenditures for solely medical journal advertising by Manufacturer Defendants reached over $14 million, with Purdue leading the pack at $8.3 million spent.

95.     These marketing messages were riddled with misleading and unsupported statements, beginning with the notion that opioids were safe and effective for long-term use, and omitted warnings of the dangers of opioid drugs.

96.     Defendant Purdue knowingly concealed the risks of opioid abuse.  For example, in May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.

97.     In a statement announcing the guilty plea, John Brownlee, U.S. Attorney for the

Western District of Virginia, stated:

> Purdue claimed it had created the miracle drug – a low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse. ***Purdue's marketing campaign worked, and sales for OxyContin skyrocketed – making billions for Purdue and millions for its top executives.***
>
> ***But OxyContin offered no miracles to those suffering in pain.  Purdue's claims that OxyContin was less addictive and less subject to abuse and diversion were false – and Purdue knew its claims were false.   The result of their misrepresentations and crimes sparked one of our nation's greatest prescription drug failures***. . . .  OxyContin was the child of marketers and bottom line financial decision making.[14]

98. Mr. Brownlee characterized Purdue's criminal activity as follows:

> First, ***Purdue trained its sales representatives to falsely inform health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse***.  Purdue ordered this training even though its own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet by simply crushing the tablet, stirring it in water, and drawing the solution through cotton into a syringe.
>
> Second, ***Purdue falsely instructed its sales representatives to inform health care providers that OxyContin could create fewer chances for addiction*** than immediate-release opioids.
>
> Third, ***Purdue sponsored training that falsely taught Purdue sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse*** than short-acting opioids.
>
> Fourth, ***Purdue falsely told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance*** to the drug.
>
> And fifth, ***Purdue falsely told health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids***, and could be used to "weed out" addicts and drug seekers.[15]

---

[14] Press Release, U.S. Attorney for the Western District of Virginia, Statement of United States Attorney John Brownlee on the Guilty Plea of the Purdue Frederick Company and Its Executives for Illegally Misbranding OxyContin (May 10, 2007), https://assets.documentcloud.org/ documents/279028/purdue-guilty-plea.pdf.
[15] *Id.*

99.     The other Manufacturer Defendants had similar practices.     Manufacturer
Defendants even mocked the possibility of addiction all while knowing the high risk of addiction
associated with their products.  The phrase "pseudo-addiction" was used to convince patients that
they were not *actually* addicted to opioids, they just thought they were.[16]  The use of the phrase
contradicted both the reality of opioid use and the data available to Manufacturer Defendants that
indicated that addiction and the possibility of addiction should be taken seriously.

100.     Manufacturer Defendants were admonished for making unsupported claims in
marketing materials.  For example, as a result of an earlier investigation into Purdue's untoward
practices, in 2007, Defendant Purdue entered a Corporate Integrity Agreement with the federal
government pledging to ensure it used only fair and accurate marketing, and monitoring and
reporting compliance.  Defendant Insys is known to have promoted Subsys for inappropriate use,
provide illegal kickbacks to physicians who prescribed Subsys, market Subsys for use by non-
cancer patients, and mislead and defrauded health insurance companies regarding patients' need
for Subsys,[17] all for the purpose of gaining profits.

101.     To avoid further scrutiny while still disseminating their unsupported claims,
Manufacturer Defendants turned to "unbranded marketing."  Unbranded marketing permitted
Manufacturer Defendants to genericize their claims by not promoting one particular drug, but
promoting the general use of opioid treatment.

102.     Manufacturer Defendants further hid behind third party or front groups to stay
anonymous through their unbranded marketing campaigns pushing the same misleading and

---

[16] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide*, at 62 (Waterford Life Sciences 2007). This material was sponsored by the Federation of State Medical Boards, a group representing 70 medical and osteopathic boards in the United States that is substantially funded by Manufacturer Defendants Purdue, Cephalon, and Endo.
[17] Pharmaceutical Executives Charged in Racketeering Scheme, https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme (accessed Dec. 27, 2017).

unsupported message that opioids allow patients to have their life back after pain, permit patients to sleep, return to work, and resume physical activity.

103.    The unbranded marketing messages were spread by physician groups like the National Pain Foundation, the American Chronic Pain Association, the American Society of Pain Educators, and the Academy of Integrative Pain Management, as well as through studies and treatises funded by Manufacturer Defendants.  Manufacturer Defendants also provided a combined $8.8 million to purportedly neutral "patient advocacy" groups from 2012 through 2017.

104.    Through these front groups, Manufacturer Defendants elevated favorable studies in widely disseminated literature and failed to fairly reflect prevailing clinical views or contrasting scientific support.

105.    Working with these groups, Manufacturer Defendants also manipulated treatment guidelines by funding the guidelines' production. The Manufacturers then distributed, at no cost to the prescribers and through their third-party salespeople, literature and guidelines fabricated to reflect their intent that chronic pain patients should undergo opioid treatment. Manufacturer Defendants worked tirelessly to hide their funding activities to make these patient advocacy groups legitimate.

106.    Overall, the message promoted by Manufacturer Defendants misled prescribers and consumers by misrepresenting that opioids improve patient functioning overall; falsely claiming that opioids have a low risk for addiction; misrepresenting the risk of addiction and the relationship between long-term opioid use and addiction; downplaying the severity of addiction and withdrawal by labeling the signs of addiction as "pseudo-addiction" and claiming that withdrawal can be easily managed; omitting information regarding non-addiction related side effects; and promoting the message that opioid treatment is a favorable initial treatment choice.

107.    Manufacturer Defendants' plans worked.  Opioids—once a niche drug—are now the most prescribed class of drugs in the United States; more than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply. Together, opioids generated $8 billion in revenue for drug companies in 2012, and more than $15 billion in 2016.

## III.    THE ROLE OF DISTRIBUTOR DEFENDANTS

108.    Rather than selling opioids directly to physicians for prescribing or to pharmacies for ultimate dispensing, Manufacturer Defendants are required to sell to Distributor Defendants, who then disseminate the products to hospitals and pharmacies.

109.    The role of the pharmaceutical distributor is not simply one of shelf stocker, freight forwarder, simple shipper, or vending machine.  A sophisticated, closed distribution system exists to move prescription drugs across the nation.  For many important reasons, this system relies upon the honesty, integrity, and accountability of distributors and pharmacies.

110.    Distributor Defendants' distribution centers must operate in accordance with the statutory provisions of the CSA.  The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances, as that term is defined in the regulation.  *See* 21 C.F.R. § 1301.74(b).  The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. § 1301.74(b).  *See* 21 U.S.C. § 842(a)(5) & (c)(1)(B).

111.    Congress devised the "closed" chain of distribution specifically to prevent the diversion and abuse that is complained of herein.  Under the closed-system, distributors serve as the eyes and ears of the government in identifying diversion threats.  Distributors are placed in a unique position to analyze data, which they obtain and track, regarding the amounts of prescription

drugs flowing into pharmacies and facilities. They use said information to adjust quotas, forecast future sales, and report to federal and state agencies.

112.     Within this closed-system, federal law imposes specific duties upon wholesale distributors to monitor, identify, halt, and, perhaps most importantly, report "suspicious orders" of controlled substances. 21 C.F.R. § 1301.74; *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).

113.     To piggyback on and respond to these federal duties, distributors created a system of "self-regulation and best practice sharing" through an industry trade group called the Healthcare Distribution Alliance (HDA), formerly known as the Healthcare Distribution Management Association (HDMA). Each of the Manufacturer and Distributor Defendants is a member of this trade group.

114.     According to the HDA, "[h]ealthcare distribution has never been just about delivery. It's about getting the right medicines to the right patients at the right time, safely and efficiently."[18]

115.     The HDA created "Industry Compliance Guidelines" based upon DEA requirements that stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines provided: "At the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers." Indeed, the HDA advises all distributors to "Know Your Customer."

116.     In fact, as the dominant players within the healthcare distribution industry, senior executives from the Distributor Defendants have historically served on the board of the HDA or

---

[18] *See* http://www.hdma.net/about/role-of-distributors

HDMA.  Currently, Cardinal's CEO Jon Giacomin serves as the Chairman of HDA and McKesson's President Mark Walchirk serves on the executive committee of this powerful trade group.

117.    The website for HDA at the time of filing explains that "[w]hile distributors do not prescribe or dispense drugs directly to patients, they do share a common goal with physicians, manufacturers, pharmacists, law enforcement officials and policymakers: to ensure a safe supply of medicines.  Among other safeguards, distributors are dedicated to keeping prescription painkillers out of the hands of people who may use them for purposes other than those for which they are intended."[19]

118.    According to its website, members of HDA, including the Manufacturer and Distributor Defendants named herein, are committed to addressing the threat of prescription painkillers ending up misused or diverted.  Their multilayered approach includes the following:

- Our members register with the DEA and follow rigorous statutory and regulatory requirements for the storage, handling and distribution of controlled substances.  These sophisticated security systems and processes help safeguard the supply chain.

- Pharmaceutical distributors coordinate with a range of supply chain partners, as well as federal and state regulatory agencies, to help prevent the diversion of prescription drugs.

- We work with supply chain stakeholders, including pharmaceutical manufacturers, hospitals, retail pharmacies and other healthcare providers, to share information and develop strategies to identify and help prevent abuse and diversion.

- We work collaboratively with law enforcement and regulators to combat bad actors who attempt to breach the security of the legitimate supply chain, coordinating with law enforcement and regulators to offer information technology, security and logistics expertise that helps locate and prosecute individuals who attempt to misuse and divert prescription drugs from the legitimate supply chain.

- We take steps to "know our customers," including actively assessing and reviewing purchases from pharmacies and healthcare providers that order controlled substances to monitor and report to the DEA if a customer's controlled substances volume or pattern of

---

[19] *See* http://www.hdma.net/issues/prescription-drug-abuse-and-diversion.

ordering might signal inappropriate use of the product.  If inappropriate use is suspected, distributors work proactively with DEA, local law enforcement and others to help in the investigation of potential diversion cases.

- We provide the DEA with additional data and reports to aid their efforts to seek out criminal behavior.  Distributors communicate about any handling of selected controlled substances to the DEA's reporting system, Automation of Reports and Consolidated Orders System (ARCOS).  This system monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to the point of sale at the dispensing/retail level.

119.    Individual Defendant Distributors also vaunt their compliance processes.  For example, Defendant McKesson uses programs that permit real time product lookup and availability, as well as control over ordering, purchasing, reconciliations, and account management.

120.    Defendant McKesson further follows Six Sigma methodology, which according to a 2013 annual shareholder report, is "an analytical approach that emphasizes setting high-quality objectives, collecting data and analyzing the results to a fine degree in order to improve processes, reduce costs and minimize errors."

121.    Like Defendant McKesson, Defendant Cardinal also employs lean Six Sigma methods in its operations.  Defendant Cardinal began its "lean journey" in 2007, as part of an initiative to drive collaboration in the health care supply chain, with the goal of achieving zero errors, zero waste, and zero lost revenue.  According to a 2012 article, Defendant Cardinal's Vice President of Inventory Management Andy Keller reported that "the company uses predictive analytics, fed by transactional information provided by suppliers, to increase the speed of communication from the manufacturer to the end customer."[20]  Mr. Keller further opined that "[w]e're a critical link in the supply chain because we talk to both suppliers and health care

---

[20] See http://www.industryweek.com/supply-chain/supply-chain-and-logistics-lean-six-sigma-keeps-cardinals-supply-chain-healthy?page=1.

providers."

122.    Defendant ABDC similarly employs Lean Six Sigma methods.  According to their website, ABDC claims: "[t]hrough our state-of-the-art supply chain technology and Lean Six Sigma-compliant business processes, your pharmacy and patients will benefit from the safest, most secure and efficient distribution system in healthcare."[21]  Defendant ABDC also boasts of "an average order accuracy rate of 99.99 percent, powered by high-touch customer support services and the latest self-service technologies that enable us to stay on top of every order."[22]

123.    Defendant ABDC also claims that its "26 world-class distribution centers leverage sophisticated workflow technology, inventory tracking systems and delivery route planning tools to bring you the products you need—when you need them most."[23]

124.    In spending millions of dollars on systems and technology to collect and analyze robust data and utilizing Lean Six Sigma methodology, Distributor Defendants should have, and likely did in fact, learn the extent of their lethal over shipments to Okmulgee County.  But rather than take steps to protect the end customer from the dangerous and addictive drugs, all Distributor Defendants chose to ignore their own reports, data, and analysis and keep the supply lines open.

125.    The claims and allegations contained herein come as no surprise to the Distributor Defendants, who have been frequently cited and penalized for their failure to comply with their statutory obligations.  For example, in 2008, Defendant McKesson paid the Department of Justice $13.25 million for failing to comply with its obligations under the CSA.  Specifically, the government alleged that McKesson failed to report suspicious orders for opioids from internet pharmacies.

---

[21] *See* http://www.amerisourcebergen.com/abcnew/pharmacies/solutions/global-sourcing-and-distribution.aspx
[22] *Id.*
[23] *Id.*

126.     On January 17, 2017, the Department of Justice announced it had reached yet another settlement with Defendant McKesson, this time to pay $150 million to resolve allegations McKesson had violated the CSA by filling millions of orders for drugs, including highly addictive opioids, without sufficient anti-abuse safeguards.

127.     According to the press release, "[f]rom 2008 until 2013, McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic."[24]

128.     As part of the nationwide settlement, Defendant McKesson agreed to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan, and Florida for multiple years, which the DOJ touted as the "most severe sanctions ever" agreed to by a DEA-registered distributor.

129.     Similarly, in 2008 Cardinal paid a $34 million fine for failing to report suspicious orders of hydrocodone.  More recently, in 2012 Defendant Cardinal's Lakeland, Florida warehouse was suspended by the DEA for two years as a result of shipping suspect orders of opioids.

130.     Distributor Defendants were on notice that the opioids they distributed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy, or problematic purposes.

131.     The information available to Distributor Defendants inherently places them at a superior position with regards to foreseeing any addiction and abuse issues arising in communities from the disproportionate amount of opioids requested when compared to the population of the county.

---

[24] Dep't of Justice, U.S. Attorney's Office, Middle District of Florida, *McKesson Agrees To Pay Record $150 Million Settlement For Failure To Report Suspicious Orders Of Pharmaceutical Drugs* (Jan. 17, 2017), *available at* https://www.justice.gov/usao-mdfl/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

132.    Distributor Defendants knew or should have known that they were supplying vast amounts of dangerous drugs to disproportionately small markets that were already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic.

133.    Specifically, Distributor Defendants knew, or should have known that their over-distribution of opioids into Okmulgee County was causing an exceedingly high rate of illegal use, abuse, misuse, and diversion of prescription opioids.  Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in Oklahoma.

134.    Furthermore, Distributor Defendants knew or should have known that the millions of doses of highly addictive opioids they were shipping into relatively small Okmulgee County were far in excess of the legitimate needs for Okmulgee County and should have been stopped and/or investigated as suspicious orders.

135.    Distributor Defendants knew or should have known that there was a high likelihood that a substantial number of the opioids they supplied to pharmacies and drug stores in Okmulgee County were being diverted to illegal use or abuse.

136.    Though they had a duty to the consuming public, both collectively and individually, Distributor Defendants failed to take any action to effectively prevent, minimize, or reduce the distribution or availability of these dangerous drugs.

137.    Distributor Defendants knowingly filled, and failed to report, suspicious orders in Okmulgee County from 2007 to the present.

138.    Distributor Defendants undertook no discernible efforts to determine whether the volume of prescription opioids they were shipping to Okmulgee County was excessive and whether any of the orders they filled qualified as suspicious orders, which should have been refused.

139.     When customer orders breached the volume thresholds set up by Distributor Defendants to meet their regulatory requirements, the Distributor Defendants adjusted their limits to allow for more dangerous and addictive pills to enter Okmulgee County.

140.     Upon information and belief, Distributor Defendants have failed to refuse to ship or supply opioids to Okmulgee County, between 2007 and the present.

141.     Indeed, Distributor Defendants paid their sales force employees' and managers' bonuses and commissions based upon the sale of most, or all, of the highly addictive opioids supplied to Okmulgee County.

142.     This commission-structure business model was a frequently used tool to promote the sale of opioids. Distributors gave monetary awards were given to employees, while Manufacturers gave Key Opinion Leaders expenses-paid trips to speaking engagements where they promoted Manufacturer Defendants' opioid medications as the treatment of choice for chronic pain.

143.     When the population of Okmulgee County is taken into consideration, Distributor Defendants delivered an excessive and unreasonable number of highly addictive controlled substances to Okmulgee County.

144.     Distributor Defendants' intentional distribution of excessive prescription pain killers to the Plaintiff's small community showed a reckless disregard to the safety of Okmulgee County and its residents.

145.     The result of Distributor Defendants' actions has been catastrophic for Okmulgee County and its residents, while the Distributor Defendants profited substantially from the opioids sold there.

## CAUSES OF ACTION

## COUNT I
## PUBLIC NUISANCE IN VIOLATION OF 50 OKLA. STAT. § 1-21
## (ALL DEFENDANTS)

146.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

147.    A public nuisance is one which affects at the same time an entire community or any considerable number of persons, although the extent of the annoyance or neighborhood, damage inflicted upon the individuals may be unequal.  *State ex rel Field v. Hess*, 540 P.2d 1165, 1170 (Okla. 1975).  A private person may maintain an action for a public nuisance if it is specially injurious to himself but not otherwise.  *Schlirf v. Loosen.*, 232 P.2d 928, 930 (Okla. 1951).

148.    Each Defendant is liable for public nuisance because each Defendant's conduct described herein caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's harm, inconvenience, or damage.

149.    All Defendants, individually and acting through their employees and agents, have created and continue to perpetuate and maintain the public nuisance to the residents of Okmulgee County through the massive sale and distribution of millions of doses of highly addictive and commonly abused prescription opioids.  By causing dangerously addictive drugs to flood the community and to be diverted for illicit purposes, in contravention of federal and state law, each Defendant injuriously affected rights common to the general public, specifically including the rights of the people of Plaintiff's community, to public health, public safety, public peace, public comfort, and public convenience.  The public nuisance caused by Defendants' acts and omissions has caused substantial annoyance, inconvenience, and injury to the public.

150.    Manufacturer Defendants misrepresented the safety and effectiveness of opioids for the treatment of chronic pain, directly, through their control of third parties, and by acting in concert with third parties.

151.    Manufacturer and Distributor Defendants' conduct includes the failure to put in place effective controls and procedures to guard against theft and diversion of opioids; to adequately design and operate a system to disclose suspicious orders of opioids; and to report suspicious orders when suspected or discovered.

152.    Manufacturer and Distributor Defendants also enabled and/or failed to prevent the illegal diversion of opioids into the black market, including through drug rings, pill mills, and other dealers in Okmulgee County, with actual knowledge, intent, and/or reckless or negligent disregard that such pills would be illegally trafficked and abused.

153.    By failing to maintain a closed distribution system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected rights common to the general public, specifically including the rights of the people of Plaintiff's community, to public health, public safety, public peace, public comfort, and public convenience.

154.    Oklahoma statute states that knowingly causing or permitting a condition to exist which injures or endangers the public health, safety, or welfare constitutes a nuisance and is a crime.  21 OKLA. STAT. § 1191.

155.    Through the acts described herein, Defendants intentionally and/or unlawfully created a public/common nuisance.

156.    The residents of Plaintiff's community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare, and safety, and to be

free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

157.    Defendants intentionally, unlawfully, and recklessly manufactured, marketed, distributed, and sold prescription opioids that Defendants knew, or reasonably should have known, would be diverted, causing widespread distribution of high dangerous and addictive prescription opioids in and/or to Plaintiff's community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's community, a higher level of fear, discomfort, and inconvenience to the residents of Plaintiff's Community, and direct costs to Plaintiff's community.

158.    Defendants unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injury the Plaintiff's community and its residents.

159.    Defendant unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Defendants' failures in this regard include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders. Such conduct was illegal.

160.    Defendants' actions have been of a continuing nature and have produced a significant and continuing effect upon the public's rights, including the public's right to health and safety. The opioids illegally distributed and possessed in Plaintiff's Community have and will be diverted, leading to abuse, addiction, crime, and public health costs.

161.    Defendants' actions were the cause or a substantial cause of opioids becoming widely available for use for non-medicinal purposes. Because of Distributor Defendants' unique position within the closed distribution system, the close relationship between Distributor Defendants and Manufacturer Defendants, and the interchange of information and strategy

between all Defendants, opioid use to become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

162.    Defendants had knowledge that opioids have a high incidence of diversion. Still, Defendants recklessly and negligently filled suspicious orders of opioids, failed to report suspicious orders of opioids, and failed to halt or refuse suspicious orders of opioids.

163.    Defendants acted recklessly and negligently in failing to maintain effective controls against diversion. Defendants acted intentionally and unlawfully in over-distributing opioids with the knowledge that they were not to be used for any legitimate medical purpose. Defendants acted with actual malice and/or a conscious disregard for the rights and safety of Plaintiff's community, as their actions had a substantial probability of creating substantial public harm.

164.    Acts and omissions specifically engaged in by Manufacturer Defendants that contributed to the public nuisance in Plaintiff's community includes but is not limited to:

   a. misrepresenting the safety and efficacy of opioids for treatment of many conditions including but not limited to chronic pain;
   b. misrepresenting the addictive nature of opioids;
   c. misrepresenting that opioids improve the overall function of patients;
   d. misrepresenting the severity and likelihood of opioid addiction;
   e. misleading doctors, patients, insurers, the government, and the general public, including through use of misleading terms like "pseudo-addiction;"
   f. misrepresenting patients' future need for increased dose amounts and frequency;
   g. falsely claiming that withdrawal is easily managed;
   h. omitting or minimizing the adverse effects of opioids and overstating the risks of alternative pain management; and
   i. misrepresenting and/or hiding facts regarding the high likelihood of abuse and diversion of opioids.

165.    These acts and omissions occurred in Okmulgee County and caused harm in Okmulgee County.  Defendants intended for the residents of Okmulgee County, including its

medical professionals, pharmacists, and elected officials, to rely on the misrepresentations, fraud, and deception.

166. The effects of Defendants' conduct are not insubstantial or fleeting. Indeed, Defendants' unlawful conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by Defendants' conduct is commonly referred to as a "crisis" or an "epidemic." It has cost people their lives and livelihoods, and otherwise caused serious injuries, and a severe disruption of public peace, order, and safety.

167. As a direct and proximate result of Defendants' wrongful conduct, the county expended public moneys to mitigate the damage caused by opioids in the community and repair the injuries described in this Complaint.

168. Plaintiff has suffered unique damages as a result of the public nuisance created by Defendants due to Plaintiff's unique position as a county within the State of Oklahoma. This harm includes, but is not limited to:

- a. increased healthcare costs;
- b. increase population in the foster care system and corresponding need for foster parents and foster-care funding;
- c. increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
- d. increased expenditure on emergency healthcare and medical services;
- e. lost value of productive and health community members and County employees;
- f. increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;
- g. increased availability of drugs for criminal use and resulting increase in criminal occurrences;
- h. increased incidence of heroin addicts who progressed from opioids to the use of heroin
- i. increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and

     j.  general interference with the enjoyment of life in Plaintiff's community.

     k.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;

     l.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

169.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

170.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.  Plaintiff does not seek damages for physical injury, mental anguish, or emotional harm, or any physical damages to property caused by Defendants' actions.

171.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney's fees, and pre- and post- judgment interest.

## COUNT II
## VIOLATION OF RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(C)-(D))
## (ALL DEFENDANTS)

172.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

173.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

174.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. §1962(c).

175.    RICO, among other provisions, makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. § 1962(c).  18 U.S.C. § 1962(d).

176.    As alleged herein, at all relevant times, Defendants moved aggressively to both increase the size of the opioid sales market and then capture a large portion of that market.  In so doing, the Manufacturer Defendants launched an aggressive nationwide campaign over-emphasizing the under-treatment of pain and deceptively marketing opioids as being: (i) rarely, if ever, addictive; (ii) safe and effective for the treatment of chronic pain; (iii) abuse resistant or deterrent; or (iv) safe and effective for other types of pain for which the drugs were not approved.

177.    All Defendants knowingly failed to report suspicious orders as required by state and federal law, thereby inundating the market with opioids.  In particular, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Opioid Fraud Enterprise"), whose purpose was to deceive opioid prescribers, the public, and regulators into believing that opioids were safe and effective for the treatment of chronic pain and presented minimal risk of addiction and/or that Defendants were in compliance with their state and federal reporting obligations.  In doing so, Defendants sought to maximize revenues from the design, manufacture, sale and distribution of opioids which, in fact, were highly addictive and often ineffective and dangerous when used for chronic and other types of pain.

178.    As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract billions of dollars of revenue.  As explained in detail below, Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) and (d).

(a)    **The Opioid Fraud Enterprise**

179.    At all relevant times, Defendants, along with other individuals and entities, including unknown third parties involved in the marketing and sale of opioids, operated an "enterprise" within the meaning of 18 U.S.C. § 1961(4), because they are a group of individuals associated in fact, even though they are not a collective legal entity.

180.    The Opioid Fraud Enterprise: (i) had an existence separate and distinct from each of its component entities; (ii) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (iii) was an ongoing organization consisting of legal entities, including, but not limited to, the Manufacturer Defendants, the Distributor Defendants, pharmacies, employees and agents of the front group organizations, as well as other entities and individuals, including physicians.

181.    Within the Opioid Fraud Enterprise, there was a common communication network by which members exchanged information on a regular basis through the use of wires and mail. The Opioid Fraud Enterprise used this common communication network for the purpose of deceptively marketing, selling, and distributing opioids to the general public.  When their products, sales, distributions, and failure to report suspicious sales were contested by other parties, the enterprise members took action to hide the scheme to continue its existence.

182.    The participants in the Opioid Fraud Enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties, and the continuing coordination of activities.  Through the enterprise, Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share and minimizing losses.

183.     Each member of the Opioid Fraud Enterprise shared in the bounty generated by the enterprise by sharing the benefit derived from increased sales of opioids and other revenue generated by the scheme to defraud prescribers and consumers and fail to report suspicious sales in Okmulgee County.

184.     The Opioid Fraud Enterprise engaged in and continues to engage in the deceptive marketing of opioids as non-addictive, as safe and effective for chronic pain, and for uses which have not been FDA-approved, and the failure to report suspicious sales.  The Opioid Fraud Enterprise has engaged in such activity for the purpose of maximizing the sale and profits of opioids.  To fulfill this purpose, the enterprise has advocated for and caused the over-prescription and over-distribution of opioids by marketing, promoting, advertising, and selling opioids throughout the country and across state boundaries and by failing to report suspicious sales.  Their receipt of monies from such activities consequentially affected interstate and foreign commerce.  The enterprise's past and ongoing practices thus constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

185.     The Opioid Fraud Enterprise functioned by marketing, selling, and distributing opioids to states, counties, other municipalities, doctors, healthcare organizations, pharmacies, and the consuming public, while failing to report suspicious sales.  Defendants as co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the enterprise's activities through the deceptive marketing and sale of opioids and the failure to report suspicious sales.

186.     Defendants participated in the operation and management of the Opioid Fraud Enterprise by directing its affairs, as described herein.  While Defendants participated in, and are

members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

187.   Each of the members of the Opioid Fraud Enterprise furthered the ends of the enterprise, through the acts and omissions pleaded above and herein.

188.   Each of the Manufacturer Defendants relentlessly promoted opioids as having little to no risk of addiction, as being safe and effective for the treatment of chronic pain and/or other uses for which the drugs were not approved.  The Manufacturer Defendants' success in maximizing sales was due to the tight collaboration among the Manufacturer Defendants through and in collaboration with the pain foundations – a formidable partnership that marketed to hundreds of thousands of prescribers across the country, including prescribers in Okmulgee County.  The relationship was strengthened, in part, by individuals, including physicians that held different leadership roles at different times across the various entities participating in the enterprise over the years.

189.   On numerous occasions, Manufacturer Defendants funded the pain foundations' marketing efforts.  Manufacturer Defendants specifically chose to partner with the pain foundations and individual physicians to publish and otherwise disseminate misleading pro-opioid material, knowing the public and prescribers would be more receptive to statements made by what they perceived to be scholarly, neutral, third-party sources.

190.   Furthermore, all Defendants knowingly failed to design and operate a system to disclose suspicious orders of controlled substances and failed to notify the appropriate DEA field division offices in their areas of suspicious orders, including "orders of unusual size, orders

deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

191.    The members of the Opioid Fraud Enterprise worked together to further the enterprise by and among the following manner and means:

> a.  jointly planning to deceptively market and manufacture opioids that were purportedly non-addictive, safe, and effective for the treatment of chronic  pain;
> b.  concealing the addictive qualities of the opioids from prescribers and the public;
> c.  misleading the public about the addictive quality and safety and efficacy of opioids;
> d.  otherwise misrepresenting or concealing the highly dangerous nature of opioids from prescribers and the public;
> e.  illegally marketing, selling, and/or distributing opioids;
> f.  collecting revenues and profits from the sale of such products for uses for which they are unapproved, unsafe, or ineffective; and/or
> g.  failing to report suspicious sales as required by the CSA.

192.    To achieve their common goals, defendants hid from the general public the full extent of the unsafe and ineffective nature of opioids for chronic pain as described herein. Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the addictive, unsafe, and often ineffective nature of opioids.

193.    The foregoing allegations support that Defendants were part of an association of entities that shared a common purpose, had relationships across the various members of the enterprise and collaborated to further the goals of the enterprise for a continuous period of time. The Manufacturer Defendants knowingly and intentionally engaged in deceptive marketing practices, and incentivized pain foundations, marketing firms, and physicians to do so as well. Defendants knowingly and intentionally failed to report suspicious orders as required by state and federal law and inundated the market with opioids.

      (b)      **Mail and Wire Fraud**

194. To carry out and attempt to carry out the scheme to defraud, Defendants, each of whom is a 'person' associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

195. Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past four years.  The multiple acts of racketeering activity which Defendants committed, or aided and abetted in the commission of, were related to each other and also posed a threat of continued racketeering activity.  They therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the enterprise.  Defendants participated in the scheme to defraud by using the mail, telephone, and Internet to transmit mailings and wires in interstate or foreign commerce.

196. In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme and/or artifice to defraud regulators, prescribers, and the public to obtain money from Okmulgee County by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the illegal scheme, Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

197.    Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include, but are not limited to:

      a.  Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell, and distribute the opioids by means of false pretenses, misrepresentations, promises, and omissions; and

      b.  Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

198.    Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, and shipment of deceptive marketing materials, the filling of suspicious orders and the misleading of regulators and the public as to Defendants' compliance with their state and federal reporting obligations.  These materials would not have been delivered, orders would not have been filled, and regulators would have not been misled but for Defendants' illegal scheme, including, but not limited to:

      a.  a publication of opioid prescribing guidelines entitled "Responsible Opioid Prescribing: A Physician's Guide," by Fishman, published by the Federation of State Medical Boards (FSMB);

      b.  the FSMB's publication of "Responsible Opioid Prescribing: A Clinician's Guide (Second Edition, Revised and Expanded)," by Fishman;

      c.  the American Pain Foundation's (APF) publication of Exit Wounds[25];

      d.  the American Academy of Pain Medicine's (AAPM) "consensus statement" and educational programs featuring Fine;

      e.  the American Psychological Association's (APA) publication and dissemination of "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse";

---

[25] The American Pain Foundation dissolved in 2012, after an investigation found that 90% of its funding came from pharmaceutical and medical-device industry, and that the group's guides downplayed the risks associated with opioid use. *See* "American Pain Foundation Closes After Senators Launch Investigation of Drugmakers," May 10, 2012, http://philanthropynewsdigest.org/news/american-pain-foundation-closes-after-senators-launch-investigation-of-drugmakers (last viewed April 30, 2018).

f.   false or misleading communications to the public and to regulators;

g.   failing to report suspicious orders as required by state and federal law;

h.   sales and marketing materials, including slide decks, presentation materials, purported guidelines, advertising, web sites, product packaging, brochures, labeling, and other writings which misrepresented, falsely promoted, and concealed the true safety and effectiveness of opioids;

i.   documents intended to facilitate the manufacture and sale of opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

j.   documents to process and receive payment for opioids, including invoices and receipts;

k.   payments to the foundations and physicians that deceptively marketed the Manufacturer Defendants' opioids;

l.   deposits of proceeds; and

m.   electronic communications.

199.   Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  For example, the Manufacturer Defendants made misrepresentations about opioids on their websites, YouTube, and through online ads, all of which were intended to mislead prescribers and the public about the safety, efficacy, and non-addictiveness of opioids.

200.   Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various affiliates, regional offices, divisions, distributors, regulators, and other third-party entities in furtherance of the scheme.  The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive prescribers, consumers, and regulators, oversupply the market, and fail to report suspicious sales.

201.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are concealed from Okmulgee County, and cannot be alleged without access to Defendants' books and records.  However, Okmulgee County has described the types of predicate

acts of mail and/or wire fraud that occurred.  The secretive nature of the enterprise's activities made the unlawful tactics discussed herein even more deceptive and harmful.

202.    The foregoing allegations support that: the Manufacturer Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market their products through the use of both print and electronic outlets; and all Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceive regulators and oversupply the market while failing to report suspicious sales.

**(c)    Conspiracy Allegations**

203.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.

204.    Defendants conspired to incentivize and encourage various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this complaint, to carry out offenses and other acts in furtherance of the conspiracy.  Defendants conspired to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their other collaborators throughout the illegal scheme and common course of conduct.  In order to achieve this goal, Defendants engaged in the aforementioned predicate acts on numerous occasions.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in defectively marketing and/or selling opioids through the use of mail and wire fraud.

205.    Indeed, for the conspiracy to succeed, each of the Defendants had to agree to deceptively market, sell, and/or distribute opioids while failing to report suspicious sales.  The unanimity of the Manufacturer Defendants' marketing tactics and all Defendants' failure to report

suspicious sales gave credence to their misleading statements and omissions to prescribers, consumers, and regulators, and directly caused opioids to inundate the market in Okmulgee County.

206.    Defendants knew and intended that government regulators, prescribers, consumers, and others, including Okmulgee County, would rely on the collective material misrepresentations and omissions made by them and the other enterprise members about opioids and suspicious sales. Defendants knew and recklessly disregarded the cost that would be suffered by the public, including Okmulgee County.

207.    The Manufacturer Defendants knew that by partnering with the pain foundations and individual physicians who carried a more neutral public image, they would be able to attribute more scientific credibility to their products, thereby increasing their sales and profits.

208.    Defendants also knew that by filling and failing to report suspicious sales, they would significantly increase their sales and profits.

209.    The foregoing illustrates defendants' liability under 18 U.S.C. § 1962(d), by engaging in their pattern of racketeering and conspiring to achieve their common goal of maximizing opioid sales.

        **(d)    Effect on Okmulgee County**

210.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from consumers, based on their misrepresentations and omissions.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.  The predicate acts all had the purpose of generating significant

revenue and profits for Defendants, at the expense of Okmulgee County.  The predicate acts were committed or caused to be committed by Defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Okmulgee County's and its residents' funds.

211.    As fully alleged herein, Okmulgee County, along with scores of other counties and municipalities, relied upon representations and omissions that were made or caused by Defendants. Plaintiffs' reliance is evidenced by the fact that they purchased opioids which never should have been introduced into the U.S. stream of commerce and whose use has now caused a nationwide epidemic of addiction and overdose.

212.    Okmulgee County's injuries, and those of other consumers, were proximately caused by defendants' racketeering activity, which directly caused the over-prescription, over-purchase, and over-consumption of opioids.  But for Defendants' misstatements and omissions and the scheme employed by the Opioid Fraud Enterprise, Okmulgee County would not have paid for opioid prescriptions for chronic pain and would not be bearing the costs of its current opioid epidemic.

213.    By reason of, and as a result of the conduct of each of the Defendants, and in particular, their pattern of racketeering activity, Okmulgee County has been injured in its business and property in multiple ways, including, but not limited to, suffering increased law enforcement/first responder and public works expenditures, including on judicial proceedings and prisons; increased expenditures for worker overtime, mental health and substance use treatment, and workers' compensation for its employees; increased emergency and treatment services and autopsies; damage to emergency equipment and vehicles; the processing and payment of fraudulent prescriptions; and lost productivity, economic opportunity, and tax revenue.

214.     Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Okmulgee County, and Okmulgee County is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**NEGLIGENCE PER SE**
**(DISTRIBUTOR DEFENDANTS)**

215.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

216.     Oklahoma recognizes negligence *per se*, when a plaintiff demonstrates the claimed injury was caused by a violation of a statute, and was of the type of injury intended to be prevented by the statute. *See Howard v. Zimmer, Inc.,* 299 P.3d 463, 467 (Okla. 2013). Finally, the injured party must be one of the class intended to be protected by the statute. *Id.*

217.     Oklahoma law requires controlled substance distributors to comply with applicable local, state, and federal laws and regulations. Okla. Admin. Code. §535:20-7-9.1. Distributor Defendants also have a duty to comply with industry standards.

218.     Oklahoma law also requires compliance with applicable local, state, and federal laws and regulations, including DEA regulations, to receive and maintain required licensure by the Oklahoma State Board of Pharmacy. Okla. Admin. Code. § 535:20-7-5(a)(1).

219.     The Oklahoma Board of Pharmacy prohibits false or fraudulent material in securing the issuance or renewal of a license. Okla. Admin. Code. § 535:20-7-5(a)(4). Distributor Defendants violated Okla. Admin. Code. § 535:20-7-5(a)(4) by knowingly making or causing to be made a false or fraudulent statement in securing issuance or renewal of a permit by engaging in fraud in connection with the sale and distribution of opioids, as alleged herein.

220.    Oklahoma incorporates into its own laws the federal requirement that Distributor Defendants, as "registrants," maintain a diversion detection and prevention plan that includes maintaining effective controls against diversion, and designing and operating a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders. *See* Okla. Admin. Code. §535:20-7-5(b), 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b).

221.    Each Distributor Defendant engaged in negligent practices by failing to monitor suspicious orders and shipments and otherwise comply with federal law in violation of 21 OKLA. STAT. § 1191, which declares that knowingly causing or permitting a condition to exist which injures or endangers the public health, safety, or welfare, constitutes a public nuisance and is a crime against the public.

222.    Each of the Distributor Defendants engaged in negligent practices by omitting the material fact of its failure to maintain effective controls against diversion, and design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders. *See* Okla. Admin. Code. §535:20-7-5(b), 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b).

223.    Each Distributor Defendant knew of the existence of suspicious orders for opioids and intentionally filled them, knowing that those opioids had a substantial likelihood for abuse and diversion.

224.    Industry standards require Distributor Defendants to:

a.  know its customers;
b.  know its customer base;
c.  know the population base served by a particular pharmacy or drug store;
d.  know the average prescriptions filled each day;

    e.   know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases;

    f.   have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes; and

    g.   know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribers.

225.    Distributor Defendants negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were or reasonably could be expected to become addicted or engaged in illicit drug transactions.

226.    Plaintiff has suffered unique damages as a result of Distributor Defendants' negligence includes, but is not limited to:

    a.   increased healthcare costs;

    b.   increase population in the foster care system and corresponding need for foster parents and foster-care funding;

    c.   increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;

    d.   increased expenditure on emergency healthcare and medical services;

    e.   lost value of productive and health community members and County employees;

    f.   increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;

    g.   increased availability of drugs for criminal use and resulting increase in criminal occurrences;

    h.   increased incidence of heroin addicts who progressed from opioids to the use of heroin

    i.   increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and

    j.   general interference with the enjoyment of life in Plaintiff's community.

    k.   increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services,

fees from regional corrections and correctional facilities, probation and parole;

l.   increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

227.   Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

228.   The aforementioned conduct was a direct breach of the statutory duty Distributor Defendants owed to Plaintiff, and this breach was the proximate cause of Plaintiff suffering damages.

**COUNT IV**
**COMMON LAW NEGLIGENCE**
**(DISTRIBUTOR DEFENDANTS)**

229.   Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

*230.*   Oklahoma recognizes negligence where there is, 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care." *Lewis v. Dust Bowl Tulsa, LLC.*, 377 P.3d 166, 170 (Okla. Civ. App. 2016) (citing *Smith v. City of Stillwater*, 328 P.3d 1192, 1200 (Okla. 2014)). The cornerstone of a negligence action is the existence of a duty, and the issue of whether a duty exists is a question of law.  If the defendant did not owe a duty of care to the plaintiff, there can be no liability for negligence as a matter of law. *Id.*

231.   While conducting business in Okmulgee County, Distributor Defendants acted under federal duties to, among other things, maintain effective controls against diversion, and report suspicious orders for opioids. *See* 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b). Distributor Defendants had a statutory duty under the Oklahoma Pharmacy Act to promote,

preserve and protect the public health, safety and welfare by and through the effective control and regulation of the practice of pharmacy and of the registration of drug outlets engaged in the manufacture, production, sale and distribution of dangerous drugs, medication, devices and such other materials as may be used in the diagnosis and treatment of injury, illness and disease. 59 OKLA. STAT. § 353.  Distributor Defendants also have a duty to comply with industry standards.

232.    Industry standards require Distributor Defendants to:

a.  know its customers;
b.  know its customer base;
c.  know the population base served by a particular pharmacy or drug store;
d.  know the average prescriptions filled each day;
e.  know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases;
f.  have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes; and
g.  know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribers.

233.    Distributor Defendants negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were or reasonably could be expected to become addicted or engaged in illicit drug transactions.

234.    Distributor Defendants violated each duty owed under Oklahoma and federal law by engaging in the above-described acts.

235.    Each Distributor Defendant knew of the existence of suspicious orders for opioids and intentionally filled them, knowing that those opioids had a substantial likelihood for abuse and diversion, resulting in harm to the community.  But for the acts of Distributor Defendants, such

harm would have not resulted to Okmulgee County because opioid addiction and associated social

issues, detailed further below, would not have occurred.

236.    Plaintiff has suffered unique damages as a result of Distributor Defendants'

negligence includes, but is not limited to:

    a.  increased healthcare costs;
    b.  increase population in the foster care system and corresponding need for foster parents and foster-care funding;
    c.  increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
    d.  increased expenditure on emergency healthcare and medical services;
    e.  lost value of productive and health community members and County employees;
    f.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;
    g.  increased availability of drugs for criminal use and resulting increase in criminal occurrences;
    h.  increased incidence of heroin addicts who progressed from opioids to the use of heroin
    i.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and
    j.  general interference with the enjoyment of life in Plaintiff's community.
    k.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;
    l.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

237.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a

result of workplace accidents, absenteeism, and decreased productivity from prescription drug

abuse caused in whole or in part by Distributor Defendants' actions.

238.    The aforementioned conduct was a direct breach of the duties Distributor Defendants owed to Plaintiff, and this breach was the proximate cause of Plaintiff suffering damages.

## COUNT V
## NEGLIGENCE PER SE
## (MANUFACTURER DEFENDANTS)

239.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

240.    Oklahoma recognizes negligence *per se*, when a plaintiff demonstrates the claimed injury was caused by a violation of a statute, and was of the type of injury intended to be prevented by the statute.  *See Howard v. Zimmer, Inc.,* 299 P.3d 463, 467 (Okla. 2013).  Finally, the injured party must be one of the class intended to be protected by the statute.  *Id.*

241.    Oklahoma law requires controlled substance manufacturers to comply with applicable local, state, and federal laws and regulations.  Okla. Admin. Code. §535:20-3-6.10.

242.    Oklahoma law also requires compliance with applicable local, state, and federal laws and regulations, including DEA regulations, to receive and maintain required licensure by the Oklahoma State Board of Pharmacy.  Okla. Admin. Code. §535:20-20-7-5(a)(1).

243.    The Oklahoma Board of Pharmacy prohibits false or fraudulent material in securing the issuance or renewal of a license. Okla. Admin. Code. §535:20-3-4.1(a)(4).  Manufacturer Defendants violated Okla. Admin. Code. §535:20-3-4.1(a)(4) by knowingly making or causing to be made a false or fraudulent statement in securing issuance or renewal of a permit by engaging in fraud in connection with the manufacturing and sale of opioids, as alleged herein.

244.    Oklahoma incorporates into its own laws the federal requirement that Manufacturer Defendants, as "registrants," maintain a diversion detection and prevention plan that includes maintaining effective controls against diversion, and designing and operating a system to disclose

suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders. *See* Okla. Admin. Code. §535:20-3-4.1(b), 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b).

245. Each Manufacturer Defendant engaged in negligent practices by failing to report suspicious orders and shipments and otherwise comply with federal law in violation of 21 OKLA. STAT. § 1191, which declares that knowingly causing or permitting a condition to exist which injures or endangers the public health, safety, or welfare, constitutes a public nuisance and is a crime against the public. The Manufacturer Defendants had knowledge of suspicious orders through their relationship with Distributor Defendants and agreements that they had with Distributor Defendants regarding sharing knowledge and information of orders by and ordering patterns of pharmacies.

246. Despite this knowing and the existing legal duty, Manufacturer Defendants, breached said duty by:

     a. Negligently marketing their opioids in Okmulgee County;

     b. Misrepresenting the addiction, abuse, and diversion potential and rates associated with their drugs;

     c. Publishing misleading information regarding the benefits of long-term opioid use while understating the lack of evidence supporting long-term opioid use and the downfalls associated with the same;

     d. Trivializing the serious risks associated with long-term opioid use, including addiction, abuse, diversion, overdose, and death;

     e. Publishing misleading information overstating the superiority of long-term opioid use when compared to alternative treatment methods including conservative treatment and non-opioid treatment;

     f. Misleading prescribers, consumers, and communities regarding addiction rates, difficulties associated with withdrawal, and prevalence of withdrawal symptoms;

     g. Marketing opioids for unintended uses, and publishing misleading information;

h.  Failing to implement reasonable controls and safeguards to identify and prevent or reduce the misuses, abuse, and diversion of their opioids;

i.  Failing to comply with reporting requirements;

j.  Having conscious disregard for suspicious orders;

k.  Negligently raising quotas and/or distributing opioids where there could be no legitimate use for the opioids being ordered;

l.  Negligently raising quotas and/or distributing opioids where the ratio of dose per person in the relevant community, including Okmulgee County, exceeded any national norm or average of opioid usage;

m.  Acting with conscious disregard for the consumers and communities, including Okmulgee County, with the sole goal of maximizing market potential and profits.

247.  The information available to Manufacturer Defendants enabled them to predict this Opioid Epidemic.  Instead of acting, they hid behind certifications and approvals by government agencies, disguised their acts as lawful behavior, influenced the medical decision making of prescribers, and failed to honor the legal duty that arose to municipalities like Okmulgee County along the way.

248.  Each Manufacturer Defendant knew their marketing was a substantial factor in the prescribing, purchasing, and use of opioids in Okmulgee County.  Still, they engaged in false and deceptive marketing practices and other acts discussed herein, in violation of the duties owed under Oklahoma and federal law.

249.  Each Manufacturer Defendant knew or should have known of the reasonable foreseeability of injure and damage to American communities, including Okmulgee County, caused by the known and foreseeable misuse, overuse, abuse, and diversion of the opioids they manufactured and sold.

250.  These acts violated statutory law and therefore constitute negligence per se.  As a direct and proximate cause of these actions, Plaintiff suffered injury and damages.

251.    Plaintiff has suffered unique damages as a result of Defendants' negligence includes, but is not limited to:

    a.  increased healthcare costs;
    b.  increase population in the foster care system and corresponding need for foster parents and foster-care funding;
    c.  increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
    d.  increased expenditure on emergency healthcare and medical services;
    e.  lost value of productive and health community members and County employees;
    f.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;
    g.  increased availability of drugs for criminal use and resulting increase in criminal occurrences;
    h.  increased incidence of heroin addicts who progressed from opioids to the use of heroin
    i.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and
    j.  general interference with the enjoyment of life in Plaintiff's community.
    k.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;
    l.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

252.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

### COUNT VI
### COMMON LAW NEGLIGENCE
### (MANUFACTURER DEFENDANTS)

253.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

254.     Oklahoma recognizes negligence where there is, 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care." *Lewis v. Dust Bowl Tulsa, LLC.*, 377 P.3d 166, 170 (Okla. Civ. App. 2016) (citing *Smith v. City of Stillwater*, 328 P.3d 1192, 1200 (Okla. 2014)). The cornerstone of a negligence action is the existence of a duty, and the issue of whether a duty exists is a question of law.  If the defendant did not owe a duty of care to the plaintiff, there can be no liability for negligence as a matter of law. *Id.*

255.     While conducting business within Oklahoma and Okmulgee County, Manufacturer Defendants owed duties under federal law to, among other things, comply with Oklahoma and federal law, maintain effective controls against diversion, reporting suspicious orders, and, generally, refrain from acting in a way that causes or permits a condition to exist which injures or endangers the public health, safety, or welfare.  *See* Okla. Admin. Code §535:20-3-6.10, 21 OKLA. STAT. §1191, 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b).

256.     Further, because of the inherent high risks associated with opioid use and the unique position by Manufacturer Defendants as most knowledgeable regarding the risk of use of opioids, Manufacturer Defendants owed a duty to use reasonable care in their actions with regarding to opioid marketing, sale, and distribution.  The sheer dangerousness of these drugs, including the known substantial threat of abuse and diversion, created a legal duty owed to the municipalities in which the drug would be distributed and consumed.

257.     Each Manufacturer Defendant acted negligently by failing to report suspicious orders and shipments and otherwise comply with federal law.  The Manufacturer Defendants had knowledge of suspicious orders through their relationship with Distributor Defendants and

agreements that they had with Distributor Defendants regarding sharing knowledge and information of orders by and ordering patterns of pharmacies.

258.    Despite this knowing and the existing legal duty, Manufacturer Defendants, breached said duty by:

      a.  Negligently marketing their opioids in Okmulgee County;
      b.  Misrepresenting the addiction, abuse, and diversion potential and rates associated with their drugs;
      c.  Publishing misleading information regarding the benefits of long-term opioid use while understating the lack of evidence supporting long-term opioid use and the downfalls associated with the same;
      d.  Trivializing the serious risks associated with long-term opioid use, including addiction, abuse, diversion, overdose, and death;
      e.  Publishing misleading information overstating the superiority of long-term opioid use when compared to alternative treatment methods including conservative treatment and non-opioid treatment;
      f.  Misleading prescribers, consumers, and communities regarding addiction rates, difficulties associated with withdrawal, and prevalence of withdrawal symptoms;
      g.  Marketing opioids for unintended uses, and publishing misleading information;
      h.  Failing to implement reasonable controls and safeguards to identify and prevent or reduce the misuses, abuse, and diversion of their opioids;
      i.  Failing to comply with reporting requirements;
      j.  Having conscious disregard for suspicious orders;
      k.  Negligently raising quotas and/or distributing opioids where there could be no legitimate use for the opioids being ordered;
      l.  Negligently raising quotas and/or distributing opioids where the ratio of dose per person in the relevant community, including Okmulgee County, exceeded any national norm or average of opioid usage;
      m.  Acting with conscious disregard for the consumers and communities, including Okmulgee County, with the sole goal of maximizing market potential and profits.

259.    The information available to Manufacturer Defendants enabled them to predict this Opioid Epidemic.  Instead of acting, they hid behind certifications and approvals by government agencies, disguised their acts as lawful behavior, influenced the medical decision making of

prescribers, and failed to honor the legal duty that arose to municipalities like Okmulgee County along the way.

260.    Each Manufacturer Defendant knew their marketing was a substantial factor in the prescribing, purchasing, and use of opioids in Okmulgee County.  Still, they engaged in false and deceptive marketing practices and other acts discussed herein, in violation of the duties owed under Oklahoma and federal law.  They further failed to use reasonable care regarding their actions in the marketing, sale, and distribution of their drugs.

261.    Each Manufacturer Defendant knew or should have known of the reasonable foreseeability of injure and damage to American communities, including Okmulgee County, caused by the known and foreseeable misuse, overuse, abuse, and diversion of the opioids they manufactured and sold.

262.    But for the acts of Manufacturer Defendants, such harm would have not resulted to Okmulgee County because opioid addiction and associated social issues, detailed further below, would not have occurred.

263.    Plaintiff has suffered unique damages as a result of Defendants' negligence includes, but is not limited to:

a.  increased healthcare costs;
b.  increase population in the foster care system and corresponding need for foster parents and foster-care funding;
c.  increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
d.  increased expenditure on emergency healthcare and medical services;
e.  lost value of productive and health community members and County employees;
f.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;

g.  increased availability of drugs for criminal use and resulting
increase in criminal occurrences;

h.  increased incidence of heroin addicts who progressed from opioids
to the use of heroin

i.  increased number of addicted community members and resulting
strain on law enforcement due to responses to overdoses, responses
to domestic dispute calls, and responses to criminal occurrences; and

j.  general interference with the enjoyment of life in Plaintiff's
community.

k.  increased expenditure on law enforcement, prosecutors and
prosecutions, courts and court personnel, public defender services,
fees from regional corrections and correctional facilities, probation
and parole;

l.  increased expenditure on public utilities, nuisance abatement,
property damage repair, and code enforcement.

264.  Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a
result of workplace accidents, absenteeism, and decreased productivity from prescription drug
abuse caused in whole or in part by Manufacturer Defendants' actions.

**COUNT VII**
**FRAUD AND FRAUDULENT MISREPRESENTATION**
**(ALL DEFENDANTS)**

265.  Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

266.  All Defendants violated their general duties not to commit fraud and to act without
deceit.

267.  As alleged herein, all Defendants made false statements regarding their compliance
with state and federal law setting forth their duties to prevent diversion, to monitor, report, and
halt suspicious orders, and/or concealed their noncompliance.

268.  As alleged herein, all Defendants knowingly and/or intentionally made
representations that were false, or omitted or concealed material facts that Defendants had a duty
to disclose. These false representation and misrepresentations and concealed facts were made with
knowledge of their falsity and with the intent of misleading Okmulgee County, the community,

Page 63 of 73

the public, physicians and prescribers in Okmulgee County, and other persons on whom Okmulgee County relied.

269.   These persons and parties reasonably and foreseeably relied on those false representations and misrepresentations, as well as the statements made by Defendants that concealed material facts.

270.   Manufacturer Defendants, individually and acting through their employees and agents, and in concert with each other, made false representations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids for the treatment of chronic pain as set forth in detail herein.

271.   Specifically, Manufacturer Defendants knew or reasonably should have known that the representations made regarding the safety and effectiveness of opioids for the treatment of chronic pain were false or incomplete and misrepresented material facts. Manufacturer Defendants willfully, knowingly, and deceptively withheld and misrepresented material facts regarding the safety and effectiveness of opioids for the treatment of chronic pain from Plaintiff, prescribers, and consumers.

272.   Additionally, Manufacturer Defendants intended that Plaintiff and its residents would rely on their representations and omissions and act upon them, so to expand the market for opioids and increase their revenues related to the sale of opioids.

273.   Further, Plaintiff and its residents reasonably relied on the representations and omissions made by Manufacturer Defendants, ignorant of the falsity of Manufacturer Defendants' representations.

274.   Plaintiff and its residents had a right to rely on Manufacturer Defendants to educate them as to the risks and benefits associated with opioid use.  Manufacturer Defendants had superior

knowledge, information, and expertise that was not within the fair and reasonable reach of Plaintiff and its residents.

275.     Distributor Defendants committed fraud by repeatedly affirming their compliance with federal and state law all the while knowing that they were no maintaining controls against diversion or reporting or refusing to fill suspicious orders.

276.     Distributor Defendants committed fraud by concealing the material facts of suspicious orders. Each Distributor Defendant knew of the existence of suspicious orders for opioids and intentionally filled them, knowing that those opioids had a substantial likelihood for abuse and diversion.

277.     As a proximate and legal result of Defendants' fraudulent misrepresentations, Plaintiff paid for the cost of opioids to treat chronic pain, including through its self-funded health care and workers' compensation plans.  Plaintiff also paid for costs and otherwise suffered losses resulting from its insureds' and its residents' opioid dependence, abuse, and addiction.

278.     By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff suffered and will continue to suffer actual injury.  Plaintiff is therefore entitled to recover those damages.

279.     The damages suffered by Plaintiff due to this fraud includes, but is not limited to:

   a.  increased healthcare costs;
   b.  increase population in the foster care system and corresponding need for foster parents and foster-care funding;
   c.  increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
   d.  increased expenditure on emergency healthcare and medical services;
   e.  lost value of productive and health community members and County employees;

    f.   increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;

    g.   increased availability of drugs for criminal use and resulting increase in criminal occurrences;

    h.   increased incidence of heroin addicts who progressed from opioids to the use of heroin

    i.   increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and

    j.   general interference with the enjoyment of life in Plaintiff's community.

    k.   increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;

    l.   increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

280.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

281.    The aforementioned conduct was a direct breach of the statutory duty Distributor Defendants owed to Plaintiff, and this breach was the proximate cause of Plaintiff suffering damages.

## COUNT VIII
## CIVIL CONSPIRACY
## (ALL DEFENDANTS)

282.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

283.    The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful over acts; and (5) damages as the proximate cause . *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158,175 (Okla. 2009). Conspiracy is actionable only where a wrong was committed giving rise to a cause of action independent of the conspiracy. *Id.*

284.     Defendants agreed to engage in a campaign to flood the market with false and misleading information about the safety of prescription opioid use for the treatment of chronic pain, to evade controls on opioid diversion, to increase opioid quotas, and to promote their use through formulary placements, not requiring pre-authorization and not promoting less addictive alternatives.

285.     The Defendants engaged in the conspiracy in an effort to profit off the increased sales of prescription opioids.

286.     Defendants accomplished their goal of flooding the market with false and misleading information regarding the safety of prescription opioids, and flooding the market with opioid medication that could not be for any legitimate medical use, in violation of multiple Oklahoma and federal laws.  These laws created a duty to, among other things, comply with Oklahoma and federal law, maintain effective controls against diversion, reporting suspicious orders, and, generally, refrain from acting in a way that causes or permits a condition to exist which injures or endangers the public health, safety, or welfare.  *See* Okla. Admin. Codes §535:20-3-4.1(b); §535:20-7-5(b), 21 U.S.C. §§ 823(a)(1), (b)(1), 21 C.F.R. §1301.74(b).

287.     To effectuate their goal of maximizing the number of opioid users and their revenues and profits at all costs, Defendants engaged in a sophisticated, well-developed, and fraudulent scheme designed to increase the prescription rate for the sale and distribution of the Defendants' opioids and to popularize the misunderstanding that opioids are effective for chronic pain and that the risk of addiction is low

288.     The Manufacturer Defendants engaged in a coordinated effort to deceive the American public and the medical profession about the efficacy and safety of opioids, including by minimizing the addictive qualities of opioids.

289.     All of the Defendants then refused to identify, investigate, report, or otherwise block suspicious prescriptions and orders despite their actual knowledge of suspicious prescriptions and drug diversion rings.  In doing so, the Defendants worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits.

290.     The formation, existence, and actions of the conspiracy described herein were essential to the success of Defendants' campaign to increase and maintain profits from unlawful sales of opioids. The conspirators were aware that, unless they agreed to act and acted jointly, sales of prescription opioids would substantially decrease, and accordingly, the profits would substantially diminish.

291.     At all relevant times, each Defendant was aware of the conspiracy, was a knowing and willing participant in the conduct of the conspiracy, and received substantial revenue from the conspiracy, in the form of sales for Manufacturer Defendants, and sales and kickbacks for Distributor Defendants who reached particular monthly goals.

292.     Such revenue was exponentially greater than it would have been had opioids been marketed appropriately and the true efficacy and safety risks of prescription opioids disclosed.

293.     As a proximate cause of the wrongful conduct committed by Defendants in furtherance of their conspiracy, Plaintiff suffered and will continue to suffer actual injury.  Plaintiff is therefore entitled to recover those damages.

294.     The damages suffered by Plaintiff due to Defendants' conspiracy includes, but is not limited to:

    a.   increased healthcare costs;
    b.   increase population in the foster care system and corresponding need for foster parents and foster-care funding;
    c.   increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;

d.  increased expenditure on emergency healthcare and medical services;

e.  lost value of productive and health community members and County employees;

f.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;

g.  increased availability of drugs for criminal use and resulting increase in criminal occurrences;

h.  increased incidence of heroin addicts who progressed from opioids to the use of heroin

i.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and

j.  general interference with the enjoyment of life in Plaintiff's community.

k.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;

l.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

295.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

**COUNT IX**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

296.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

297.    Defendants have unjustly retained benefits to Plaintiff's detriment, and the Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

298.    First, by illegally and deceptively promoting opioids to treat chronic pain, directly, through their control of third parties, and by acting in concert with third parties, Defendants have benefited themselves at Plaintiff's expense.

299.    Plaintiff has made payments for opioids prescribed for the treatment of chronic pain, and Defendants knowingly benefited from those payments, either by directly receiving such payments or by receiving fees, rebates, and/or other forms of compensation in connection with the purchase and sale of opioids for the treatment of chronic pain.

300.    Plaintiff would not have made these payments and Defendants would not have received these benefits in the absence of Defendants' deceptive promotion of opioids as described in this Complaint.

301.    It is unjust for Defendants to retain benefits resulting from these payments.

302.    Second, Defendants have unjustly benefited from Plaintiff's shouldering of the external costs of the Opioid Epidemic resulting from Defendants' illegal and deceptive promotion of opioids for chronic pain.  Benefits may take "any form of advantage," including when a person "satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." Restat. 1st of Restitution, § 1, cmt b.

303.    Plaintiff has expended substantial amounts of money that it would not have otherwise expended on numerous services, including, but not limited to: law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, emergency services, healthcare, drug abuse education and treatment, public utilities, nuisance abatement, property damage repair, and code enforcement.

304.    Plaintiff also has lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

305.    Plaintiff will continue to incur these increased costs, or continue to suffer these losses, in the future as a result of Defendants' actions.

306.    Defendants know of, or have reason to know of, and have been advantaged by Plaintiff's bearing of the external costs of the Opioid Epidemic.

307.    It is unjust for Defendants to retain the benefits conferred by Plaintiff's bearing of the external costs of the Opioid Epidemic.

308.    Collectively, Defendants made and continue to make substantial profits while fueling the prescription drug epidemic in Okmulgee County.

309.    As a matter of equity, Defendant should be required to disgorge all unjust enrichment to Okmulgee County.

## PRAYER

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.    Order a jury trial on all issues so triable to determine damages as a result of the all Defendants' actions outlined in this Complaint;

2.    Enter Judgment in favor of Plaintiff;

3.    Enter a temporary restraining order which:

    a.  Prevents all Defendants from continuing to violate Oklahoma laws;

    b.  Mandates that Distributor Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Okmulgee County;

    c.  Mandates Distributor Defendants submit their system for determining suspicious order to those Oklahoma authorities for prior approval, and to enjoin Distributor Defendants from distributing any opioids in Okmulgee County for any illegitimate medical purpose;

    d.  Mandates Manufacturer and Distributor Defendants provide Plaintiff with the assistance necessary to address the addiction and

the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

    e.   Otherwise abates the public nuisance caused in whole or in part by Defendants' actions

4.    Enter a permanent restraining order which:

    a.   Prevents Defendants from continuing to violate Oklahoma laws;

    b.   Mandates that Distributor Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Okmulgee County;

    c.   Mandates Distributor Defendants submit their system for determining suspicious order to those Oklahoma authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in Okmulgee County for any illegitimate medical purpose;

    d.   Mandates Manufacturer and Distributor Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

    e.   Otherwise abates the public nuisance caused in whole or in part by Defendants

5.    Order equitable relief, including, but not limited to restitution and disgorgement;

6.    Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7.    Award attorneys' fees and costs; and

8.    Award such other relief as this Court deems just and fair;

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Respectfully submitted,


s/ Bradford D. Barron
Bradford D. Barron, OBA #17571
Zachary T. Barron, OBA #18919
The Barron Law Firm, PLLC
PO Box 369
Claremore, OK 74018
(918)341-8402 Phone
(918)515-4691 Fax
bbarron@barronlawfirmok.com
zbarron@barronlawfirmok.com

and

Ken B. Privett, OBA #7324
PO Box 97
Pawnee, OK 74058
(918)762-2705 Phone
Kprivett@sbcglobal.net

and

James D. Young (*Pro Hac Vice to be filed*)
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904) 398-2722 Phone

*Attorneys for Plaintiff*